The next matter, number 23-1801, Colony Place South, Inc. et al. v. Volvo Car USA, LLC et al. At this time, would counsel for the appellants please introduce himself on the record to begin? May it please the court, Jason Allen on behalf of the appellants. I'd like to reserve three minutes for rebuttal. OK, you may. OK, let's begin. Thank you, Your Honor. This case is about Volvo's prepaid maintenance program, or the PPM, and whether Chapter 93B, or what I'll refer to as the Dealer Act, regulates that compensation under the PPM. The district court held that the act doesn't regulate the PPM's labor compensation because, and I'm paraphrasing here, but other parties, plural, offer the PPM, not Volvo. Respectfully, the appellant suggests that the district court's order should be reversed. The PPM is, and has always been, Volvo's PPM. And Volvo's decision to use other parties, such as the appellees here, VFS, Volvo Financial Services, and FWS, for management of the PPM does not avoid the act's application. Alternatively, the order should be remanded due to the numerous disputes of material fact that were contained within the parties' respective motions. So before I get into the nuts and bolts about who issued and who offered, I want to take a step back. The claims in this case rise under the Dealer Act, which by its terms regulates, quote, unfair business practices. This court and the Massachusetts Supreme Court have repeatedly recognized that Chapter 93B is aimed primarily at protecting motor vehicle dealers from injury caused by unfair business practices of manufacturers and distributors. But these other entities are not manufacturers and distributors. That's correct, Your Honor. I don't think that's a factual dispute. So then why would Chapter 93B then apply? So Your Honor, Chapter 93B would apply because the Massachusetts Supreme Court recognized over 45 years ago that this is also a consumer protection statute. That's number one. Here, consumers are told that this is a Volvo's plan that they can use anywhere. And yet, here, the appellees are telling you it's not our plan and they don't get to use it anywhere. And your position would be there's a symbiotic relationship, therefore, it should all be treated de facto as Volvo. The undisputed facts at the district court showed that there was a symbiotic relationship. Now, there are a number of them. Sort of broadly about those facts, when you entered into the PPM with Fidelity, are there any facts in the record that you were forced to do that or that there was pressure from Volvo to do so or negative consequences that would happen? The facts in the record are my client's testimony that when he met with them, he was told he had to do this as an obligation of being a Volvo dealer and that this was a Volvo product. Those are disputed material facts. I'm sorry. What was he told he had to do? Offer the PPM. He was told that's what the testimony is going to show, is that he was told he had to offer the PPM. Yes, Your Honor. And I believe both of those are quoted either in our initial brief or our reply brief. Do the PPMs represent another revenue stream to your client? They do if they're sold, Yes, Your Honor. Can I just ask you, you're arguing that it's a franchise or obligation to sell the PPM. Do you have to prove that to win here? Can you show that it was just an obligation to service consumers who bought a PPM somewhere else? Can you address that? I can. Thank you, Your Honor. So respectfully, I don't believe that we have to address that issue. The district court didn't go that far. They just said Volvo, the manufacturer or distributor, did not issue this. Other parties did. What the statute gets to is exactly what Your Honor just asked, which is service. The appellees argue this from the sales side. You don't have to sell this. This is voluntary. The statute is asking, under your franchise obligations, do you furnish labor parts or materials? That's what the statute is asking. And as it relates to that, we have an obligation to have satisfied customers. It's undisputed that we have an obligation to do that. And then if we take a step back, as it relates to franchise obligation, that term is undefined within this particular section. So what do we look to? We look to, how does the act define franchise and the franchise relationship? And what we see there in both of those instances is the act goes much broader than the four corners of the franchise agreement between the parties. And it includes oral arrangements. And it includes any agreements in which Volvo, the distributor, has a direct or indirect interest in. So when we look at that, clearly Volvo has an interest in the PPM. But counsel, can I focus you more on the, I understand your arguments and I looked at the statute and I'm just trying to understand the facts better. What are the facts showing that you're obligated to provide a service to a customer who comes in with a PPM that was sold by a different dealer? Why are you obligated? I understand no business wants to have an unhappy customer. But how are you actually obligated to service it? What facts can you point us to? I think the most obvious fact, Your Honor, is that Volvo tells the world that this PPM is good at any Volvo dealer. They make that representation. We didn't. The representation is still good. It still exists. Volvo continues. And for example, sends the welcome letter to the customer. So all of those things, when you take those together, show that there is an expectation that this service has to be done. And then you marry that with, and this is undisputed, Volvo measures our client based on customer satisfaction, based on, at least in part, customers under the PPM. But I guess just kind of circle back to the question of whether you're obligated to service the PPM. What do the 19 dealers do who don't sell these? Respectfully, Your Honor, I think that entire line of argument is a complete red herring. Those dealers are unidentified, and they're not within the state of Massachusetts governed by this act. Every dealer in the state of Massachusetts sells and services the PPM. Which to our point, evidence is that it is an obligation. It's not voluntary. Volvo is telling the world, this is our program. And the record shows that the testimony from VFS and Volvo was, we tell the world that, because that's where the value is. We want the customers to believe this is a Volvo program. So if the customers believe it's a Volvo program, and they believe what Volvo is saying, we have an obligation to do these services, in addition to all the- Would that be like a estoppel obligation, at least? I'm sorry, Your Honor. Would that be like some sort of estoppel, that Volvo cannot say, no, it's not my obligation? Well, they're making a representation. Then what you're saying is that they can't say, well, that's not my obligation now. Exactly, Your Honor. So they're estopped from arguing that. That's exactly right, Your Honor. And when you look back at, and I know you're asking very specific questions, and I want to just zoom back out to the particular sections in the statute that I think bear on this. In particular, so the statute defines franchise relationship. And what does it say about that? It says it shall apply to all actions by a manufacturer or distributor which relate to the franchise relationship. What the appellees have argued here is it has to be in the contract. Statute does not say that. It applies to all actions. It applies to business practices which relate to the franchise relationship and all other such agreements in which the manufacturer or distributor has a direct or indirect interest. Counsel, what happens right now, because again, we can read the statute, but we're not as familiar with the industry, obviously, as you are. What happens right now if somebody, and maybe this doesn't happen in Massachusetts, but somebody comes to a particular dealer, but the PPM was issued by a different dealer in Massachusetts? What does the dealer do? So in my client's instance, they perform the service. And then they're paid a different rate than they're entitled to. They're paid the rate that the other dealer is entitled to. Not the rate set by the statute. Correct. Can you explain that? Because Volvo has argued that you can sell the PPMs, dealers can sell the PPMs at whatever price they want. And then there's a tier structure that you can choose, and that regulates what payment you receive in reimbursement. Can you just explain to us how that works? Sure. It works very simply. Volvo tells the dealer what the tier structure will be, and the dealer can take it or leave it. The tier structure does not account for what my client's retail rate is. And so this proposition that we've set these tiers, and you can select your reimbursement rate based on these tiers, that's true in the abstract. The problem is, Volvo chooses what dollar amounts those are. We don't provide input on that. But what does it mean that you can sell the PPMs for whatever price you like? Just very practically, can you explain that to us? Sure. There's a cost to selling the good. And the relationship tries to, you know, is essentially, if your reimbursement level is higher, then the cost of the good is higher. And that also is an issue. Now it's deep in the weeds as far as that. But if the reimbursement rate is higher, the tier, then the cost of the good is going to be higher, which also impacts the selling of the good later. If my client was reimbursed at its retail amount, which Volvo did before, before they changed the management, they followed the statute. They decided, and I think this is very important, in the response brief, Volvo admits it was their choice. On page 25 of the response brief, they say, Volvo USA transferred management of the PPM to Volvo Financial. And on page 6, they also confirm this was Volvo's decision. So they set this into play. They paid retail before. And they don't pay retail anymore. And then as a result, my clients are not receiving the reimbursement amount set by statute that they get for all other warranty jobs. And then the cost of selling this good also goes up, because Volvo forces them to choose. Do you want a higher reimbursement amount? Which still doesn't come up to what their statutory amount is. Or do you want to pay more for the good? By the way, you're saying Volvo, but Fidelity is also, are you using the two interchangeably? In the, I'm sorry, Your Honor, can you specify in what? In the answer you just gave. So for warranty services, pure warranty services, Volvo car, I'm going to butcher the legal title of the name. Volvo USA pays my client. For these products, for some of them, Fidelity warranty services reimburses my client. And there's a factual dispute about this as well. But for some of this, the reimbursement under the PPM, those are submitted through Volvo's warranty system. Does that answer Your Honor's question? Let me ask you one quick final question. I assume there is no case from the SJC specifically on point regarding PPS, is correct? Your Honor, that's exactly right. So the follow-up question then is, is this a matter that should be perhaps certified to the Massachusetts SJC? Your Honor, my clients would not oppose that. But I think both this court and the SJC have issued numerous opinions on the purpose of this statute and interpreting the specifics of it. I had one more question. Looking specifically at the language of the statute of 9B1, and I may sort of not get this out correctly, but when I'm looking at that statute, and I'll just assume for the sake of this question that fidelity is a common entity, I'm wondering about that clause, unless issued by a common entity that is not a manufacturer. Because it seems to me you've got to get around that clause in order to fall into this statute. Am I not reading that correctly? How would you answer that question? I understand the question, Your Honor. So two parts to that answer. First, respectfully, I don't believe we need to get there, because the district court didn't rule on that issue. They didn't issue that. And the athletes have not argued for that. It's a disputed issue of fact as to whether the other two parties are common entities. So it's a factual dispute that should go back. On the second piece of that, let's just assume that they are, to Your Honor's question, that you're assuming that they are. Let's look at what that statute did. It imposed additional obligations on a manufacturer, a distributor, and a common entity. Now, there's the exception there. The trick here is the athlete's argument would be that that exception actually limits the statute. It doesn't expand it. So the legislature added in another group of entities, common entities, that are regulated. And what the athletes are saying is, actually, the exception that follows the comma limits who this applies to. We can use whoever we want, unless it's a manufacturer. And that doesn't match anything else in the act, including the prohibition on using agents. And what we've argued in our brief is that the statute was copied from the Florida statute. Massachusetts statute on this was copied from the Florida statute. And in Florida, there is a distributor who has common ownership with one of the parties here, JM&A. And so what this is intended to do is allow truly separate companies that operate separately to offer these products that are not branded, that are not deemed to be manufactured products. And they can operate their businesses, even though there is common ownership. Does that answer your question, Your Honor? I think so. I mean, I think maybe you're saying, that shouldn't have been there. It's inelegant drafting. And we should ignore it. I think it's inelegant drafting. I think it works with the interpretation that we've provided based on the Florida example and the rest of the statute. I think it works. The interpretation that the other parties have provided would essentially make it be manufacturer, distributor, or manufacturer. And I can't wrap my head around that. Just one very quick follow-up to something you said. You said the statute was literally copied from the Florida statute. So in deciding, we may certify. But if we decide the case, should we have to look to Florida law also? Your Honor, that's my home state and my hometown. And there are no decisions in Florida on that. I think it would be fair to look at that, hence the use of the factual example of Southeastern Toyota and JM&A as common entities. Well, thank you very much. Let's hear from Counsel Rayfield, then. Please do introduce yourself on the record to begin. May it please the Court, Mike Rayfield for the appellees. We raised a number of grounds for summary judgment. Counsel, before you discuss those, if you could briefly address, and that way I won't interrupt you in the middle of the arguments, about the certification issue. Is this a case, what's your client's position as to certification? Our position is that it's not necessary, because the statute is clear enough. And I think it's clear in two respects. One is that the Volvo PPM isn't a franchise obligation. And two, it wasn't offered by a manufacturer, distributor, or common entity. This isn't inelegant drafting. They want to read that language out of the statute. But I do want to start with the franchise obligation point. And our position is that the PPM is a completely voluntary product that the dealers are free to accept or reject through a contract that's distinct from the franchise agreements. Many dealers choose to sell it, but it's undisputed that 19 Volvo dealers in the United States have decided not to. Counsel, what about servicing it, servicing the PPMs? Let's put aside whether they're obligated to sell it. I thought in your brief, you essentially admit at page 18, note 5, that dealers are obligated to service. If a customer comes in and has a PPM, and even if the dealer hasn't sold that particular PPM, doesn't sell PPMs at all, the dealer has to provide service to the customer and then can submit for reimbursement. Tell me if I'm wrong, but I think I have the right page number there. We don't concede that at all. And I'm looking at the footnotes. Well, let me just answer your question. I mean, I think I have a legal response and a factual response to that point on the servicing point. So the legal response is that nothing in the franchise agreements requires the dealers to service the vehicles. To the contrary, the retailer agreements tell the dealers exactly what does need to be serviced. And I'll cite the court JA 46. And I wrote this quote down because I think it's critical. As part of your fixed operations, you will do the following. Carry out warranty, recall, and free factory scheduled maintenance work on Volvos that customers bring to you. And it goes on to also say, carry out pre-delivery inspection of new Volvos. So this is an exclusive list in the franchise agreements of what the dealers have to service. And it doesn't mention the PPM or anything like it. Now, the factual response is that the allegation that the dealers are somehow required to service the PPM has no basis in the record. I would actually cite their opening brief at page 10, where they acknowledge that they can refuse to service a vehicle if they've opted out of the PPM, or in the very rare case where the customer purchased the PPM from a dealer who chose a lower reimbursement tier. And that's their brief at 10 and the supplemental appendix 1233 to 335, which is the unrebutted testimony of Volvo financials representative. Now, in fact, the evidence also shows that dealers who opt out of the PPM, if they don't want to refuse service, they can choose to service the vehicle. And this is what our footnote is getting at. They can choose to service the vehicle, in which case they get reimbursed directly by Fidelity at the retail rate. That's supplementary. At the retail rate, not based on the tiers selected by the other dealer? Well, no, because no, this is in the situation where the dealer is not participating at all in the program. Correct. But the testimony is that they get their retail rate if they're non-participating and a dealer shows up. And a customer shows up. I'm sorry, customer shows up. They get their retail rate. From Fidelity, directly from Fidelity. So what the dealers are really complaining about is not so much that they're required to participate, but that if they do participate, they might, in an extremely rare situation, have to service a vehicle for less than the reimbursement rate that they want. And that's just not a claim under Chapter 93B. The statute, I respectfully submit, could not be clearer that it covers franchise obligations. Obligations arising out of franchise agreements. So the dealers also, and to get back to the purpose of the statute, the whole point of Chapter 93B is to prevent franchisers from using, in the words of the SJC, their oppressive power to harm dealers. That's the Beard Motors case. Now, the dealers don't have a ton of choice when it comes to the franchise contracts. They have to accept them, or they can't deal the vehicles at all. But with the PPM, things are flexible at every step. They choose to enter into the administrative agreement, which they can terminate at any time. They choose the PPM among a set of financing and insurance products. They choose the sales price for the PPM, and they choose the reimbursement tier. So again, this is flexible at every step. It's not the kind of oppressive practice that's where dealers' practices are being dictated by a manufacturer or distributor. And so to get to my colleague's, I think, second main argument on the franchise obligation issue, I think my friend's point is essentially that if the dealers don't participate in the PPM, there might be some adverse results. Volvo might rate them poorly, or he posits he might even terminate their agreements. And I would just say that whether or not that's true, it still doesn't make the PPM a franchise obligation. By the dealer's logic, they would be required to sell every Volvo product on the theory that Volvo USA would presumably prefer that they sell that product. But we know that isn't right, because they haven't identified a single adverse action that Volvo USA has taken against the dealer for declining to sell the PPM. And we also know, critically, that the plaintiff dealers have opted out of some of the financing and insurance products available under the administrative agreement with no apparent problem. So there's no reason to think that the PPM would be treated by Volvo USA any differently. Can I ask you, what would it mean for Fidelity to sell its own non-Volvo branded PPMs? Could a Volvo driver purchase a Fidelity branded PPM? I think you say somewhere that you don't only just sell Volvo. There aren't only just Volvo branded items sold at the dealer's. I think I have this right, but I'm pretty sure. So Fidelity sells both non-branded and branded PPMs. But I'm fairly sure that a Volvo driver can only sell. Your money. Can, I'm sorry, that threw me off. But I think that a Volvo driver could purchase a non-branded PPM from Fidelity if it wants to. But counsel, you gave this example that there are a number of products that Volvo offers, and there's no suggestion that a dealer has to offer all of them. But is there any other product like this one where, I mean, Volvo says on its website, as I understand it, that PPMs are available at every dealership? It's a representation it makes to its customers. You can go to any dealer in the United States, and they will service your PPM. So doesn't that make this a different type of product from just every product? Or is it your position that for every product, that's Volvo's representation? I don't think that makes it a franchise obligation, is my point. Why? Why not? It doesn't say part of the franchise contract. It uses the word obligation, which is obviously a different word. And we have to look at the words the legislature actually chose. So Volvo is telling all of its customers that you can go to any dealer in the United States, and they will provide this service for you. How is it not an obligation? I mean, that is generally true, that Volvo, that customers can go to just about every dealership in the country and get services. But that's not what your website says, right? It doesn't say it's generally true that most of the time, except for 4%, it says you can go anywhere in the United States, any dealer, and they will service your car. Fair enough. But my response to that would be that this doesn't turn, there's no evidence in the case that dealers were somehow relying on Volvo's marketing materials over their own contracts with Fidelity. I thought that's what your opposing counsel just said, that that was his understanding based on interactions with Volvo's representatives and the website, that this was an obligation for the dealers. I think that they, I don't think there's testimony to support that. I thought he said that was in a deposition transcript. Do you disagree with that record site? I do. I didn't hear a record site. I didn't see it in any of the briefs. And in fact, what the record shows is that the dealers conceded at their deposition, and this is at JA 1091 to 92, that Volvo Financial's representative told them that they didn't have to sell or honor the PPM. So they were actually told the opposite. I was sort of scrambling to try to figure out where that citation was coming from, and I couldn't find it. But with the remaining time I have, I do want to get to the who is the issuer question. And this is sort of an independent reason that the district court should be affirmed, because the PPM isn't issued by Volvo USA or its common entity. Now, plaintiffs try to evade this language in two ways. But I do want to focus on where we left off with the dealer's argument, which is that the language of the statute is issued by the manufacturer or distributor or its common entity, unless issued by a common entity that is not a manufacturer. And there's no dispute that Fidelity, the company that is offering the product and administering it, is not a manufacturer or a distributor. And unlike my friend's suggestion, this language makes sense if you look at what the word common entity is actually modifying. It says issued by a manufacturer or distributor or its common entity. So the its common entity is modifying distributor. And so what that means is the statute covers only one, manufacturers, two, distributors, and three, common entities of distributors that are also manufacturers. And that makes sense, because Chapter 93B was designed to regulate dealings among manufacturers, distributors, and dealers. The legislature wasn't trying to regulate contracts between dealers and third parties that make financial products. And so I also want to address this. So what you're saying is for appellants to succeed, maybe prospectively, the Massachusetts legislature would have to amend the statute or include the PPMs. Well, the legislature would either prospectively pass a new law, and then for future cases, it would. But right now, it hasn't. Yeah, right now the statute, the program has to be issued by a manufacturer, distributor, or a common entity, which is not, which is also not. My point is we shouldn't read that as a court into the statute. It should be the legislature to do that prospectively if it so chooses. Of course. I think that's absolutely right. And I do want to address just briefly this point that's sort of made throughout my colleague's briefing, that fidelity is kind of just like a shell for Volvo USA. That is just not what the record shows. Volvo USA does have involvement in the PPM, which is necessary, because it's the distributor of the cars related to the financial product. But there's no evidence that Volvo USA directs fidelity to administer the PPM in a certain way. Fidelity is the one that handles the day-to-day operations of the PPM. It has a whole website and field team devoted to coordinating with dealers. It resolves customer issues. And when customers reach out to Volvo USA about the PPM, they are referred to Fidelity. This is all undisputed testimony in the record. Now, there is a good amount of collaboration, actually, between Fidelity and Volvo Financial. But Volvo Financial also isn't covered by Section 93B, because it's not a manufacturer or distributor. Counsel, can I just follow up on that? Can I just take you back to the statutory language for one second? Of course. So if we're looking at the key clause issued by the manufacturer or distributor, or it's a common entity, unless issued by a common entity, but it's not a manufacturer, and we're trying to understand what that means based on the plain language you've offered, alternative interpretations, what about if we focus? I think one thing that maybe hasn't been addressed is, what if we focus on the use of the article, the? So it's issued by the manufacturer or distributor. So the manufacturer or the distributor. Or a common entity, or it's a common entity, unless the common entity is not a manufacturer. So in other words, the manufacturer can issue it, the distributor can issue it, and then you're allowed to have a common entity with one of them, but the common entity also has to be a manufacturer. So it doesn't have to be the manufacturer. Just has to be a common entity that's also a manufacturer. My question for you is, does that make sense in light of the industry? Are there such things? Is there a common entity of the manufacturer that would also be a manufacturer? There would. I think my colleague is right, that there typically is not. Well, yes, I think that, yes. I mean, Volvo Car Sweden is a manufacturer who is a common entity of Volvo USA, who is a manufacturer. So I'm struggling a little bit to understand the import of the word the, but I think that there are two reasons why this doesn't apply. One is that this term, Fidelity, isn't a common entity of anyone here. I don't think the term can reasonably apply to an entity that has a simple contractual relationship with Volvo USA's affiliate. Fidelity isn't in any way affiliated with Volvo USA. The relevant contracts are between Volvo Financial and the dealers. But then if you decide that Fidelity is a common entity somehow, then you get into the problem that it's excluded under the statute, under the manufacturer. So you think we just don't need to get to this tricky statutory construction issue of the language that is, by everyone's admission, hard to read, because it's just not a common entity, no matter what. I think that's right. And actually, the Florida statute that my colleague referenced does, unlike this one, define common entity. It has a definition, right? And it wouldn't qualify, correct? And it wouldn't qualify. But it's not defined here, right? It's not defined here. And so that was why I was a little bit hesitant to rely on the Florida statute until my colleague did. But I think that there is an ordinary meaning of common entity. And it doesn't mean simply you've entered into a contract with an affiliate of the entity. Thank you, Your Honor. Thank you, Counsel. OK. Mr. Allen, you have three minutes for rebuttal. And then we're going to take a break, a short break. Please reintroduce yourself on the record to begin. Jason Allen, on behalf of the appellants. Go ahead. All right, thank you, Your Honor. Your Honor, quickly, just to address a couple of the factual questions. My client's testimony, it's Statement of Fact Number 50, Document 64. And the underlying motion, I believe the appendix signed is A247. But I'm certain that it's Statement of Fact Number 50. FWS communicated to Joseph Lamb that plaintiffs were obligated to sign the administrative agreement as a condition of being a retailer. Disputed. Absolutely, vehemently dispute that our initial brief admits that servicing the vehicles is not a franchise obligation. The example and the site to the brief that opposing counsel listed is a hypothetical that we included to show the absurdity of their position. It was not an admission that we do not have to perform the service. And, Your Honors, I think we just, to sum this up, this is not a breach of contract case. It's an unfair business practices case. You do not need to have a contractual obligation to have an unfair business practice. We believe the record supports there is a franchise obligation to do that. But even if there were not, this regulates business practices. The statute over and over and over says you cannot do this, you cannot do this, you cannot do this. Even if you have a contract, you cannot do this. It regulates the totality of the relationship, both in defining franchise and franchise relationship. So this red herring that, hey, Volvo doesn't have a contract with FWS, and Volvo's contract that they unilaterally write with the dealer doesn't expressly include the PPM is an absolute red herring. This regulates business practices. The PPM is undisputedly a business practice of Volvo USA, for all of the reasons in the factual recitation that's in the briefing. And finally, Your Honor, I suggest that, and this issue went completely unaddressed by the appellees in their response brief. 47 disputed issues of material fact that they raised at the district court. Seven of which, they only put forth 17 statements of fact, because they tried to limit it to this four-corner contract analysis. Seven of those were disputed, including the fundamental issue of who is the issuer of the PPM. That's statements of fact, I believe, number four and seven. Those are fundamental disputes. Who issues the PPM was disputed. That FWS is this independent entity that processes all the claims, disputed. And so for those reasons, Your Honor, we believe that it should be reversed and remanded. Thank you. OK, thank you. We're going to take a.